# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

United States Court of Appeals
Fifth Circuit

**F I L E D**

February 4, 2010

Charles R. Fulbruge III
Clerk

No. 08-41214

UNITED STATES OF AMERICA,

Plaintiff - Appellee

v.

JUAN ANTONIO DELGADO,

Defendant - Appellant

Appeal from the United States District Court
for the Southern District of Texas
USDC No. 5:08-CR-398-1

Before KING, BARKSDALE, and ELROD, Circuit Judges.

PER CURIAM:[*]

Juan Antonio Delgado appeals his jury conviction on two counts of transporting an undocumented alien by means of a motor vehicle within the United States for private financial gain, in violation of 8 U.S.C. § 1324(a)(1)(A)(ii), (a)(1)(B)(i), and 18 U.S.C. § 2. On appeal, Delgado challenges the district court's admission of identification testimony, arguing that the identification procedures (which included a one-man showup) were unduly

[*] Pursuant to 5TH CIR. R. 47.5, the court has determined that this opinion should not be published and is not precedent except under the limited circumstances set forth in 5TH CIR. R. 47.5.4.

suggestive. For the following reasons, we AFFIRM the judgment of the district court.

## FACTUAL AND PROCEDURAL BACKGROUND

On the night of March 9, 2008, a tractor trailer driven by Delgado, a United States citizen, was stopped by United States Border Patrol agents at the Interstate 35 checkpoint near Laredo, Texas. During the initial inspection of the tractor trailer, a Border Patrol dog signaled the possibility of concealed persons or contraband inside the tractor trailer. After opening the trailer, agents discovered fifteen undocumented immigrants (aliens) lying under a blue tarp amongst automobile parts in the trailer. The Border Patrol agents then detained Delgado and the fifteen aliens.

The Border Patrol agents interviewed Delgado, obtained biographical information from him, photographed him, and placed him in a holding cell. The biographical information indicates that Delgado is of average height, and the Border Patrol photograph shows that, on the night of his arrest, Delgado had a mustache and a beard and was wearing a cap. Delgado also provided a statement to the Border Patrol in which he claimed that he did not know that the trailer was loaded with aliens and that he had no reason to suspect as much.

The Border Patrol agents also interviewed the aliens and decided to detain two of them, sisters Eusebia and Luisa Aviles–Vences, as material witnesses. Both provided statements regarding how and when they had come to the United States. Eusebia and Luisa were also brought separately by the Border Patrol agents to view Delgado and asked whether they could identify him as the driver of the tractor trailer. Luisa identified Delgado and provided information about his appearance. Eusebia provided some information about the person who put

her in the trailer,[1] but upon seeing Delgado, she was unable to say whether he was that person.[2]

The Government charged Delgado with two counts of violating 8 U.S.C. § 1324(a)(1)(A)(ii), (a)(1)(B)(i), and 18 U.S.C. § 2 in using a motor vehicle to transport Eusebia and Luisa, aliens, for commercial advantage or private financial gain, while knowing, or recklessly disregarding, that they had come to, entered, and remained in the United States illegally.  Before trial, Delgado filed a motion to suppress Eusebia's and Luisa's out-of-court identification statements,[3] arguing that the out-of-court identification process was impermissibly suggestive and thus conducive to irreparable mistake such that any identification of him by either Eusebia or Luisa would violate his due process rights.  The district court denied the motion, but the court stated that the parties could examine the method of identification at trial, at which time Delgado could re-urge his motion to suppress.[4]

At trial, Eusebia and Luisa testified that their aunt had arranged to smuggle them and their brother into the United States and transport them to Austin, Texas, for $2500 per person.  Both sisters also testified that they had

---

[1] The record indicates that on March 9 Eusebia was able to confirm that the man she had seen by the trailer was wearing a cap and had a mustache.

[2] The record is unclear regarding whether the sisters viewed Delgado before providing information about his appearance.

[3] Delgado apparently considered the Border Patrol's report, which stated that both sisters had provided information that Delgado was present when they were loaded into the trailer, to be out-of-court identification evidence.

[4] One district judge (Kazen, J.) presided over pre-trial motions and procedures while another district judge (Walter, J.) presided over the trial.

crossed into the United States via boat near Laredo, Texas, on March 5, 2008, and that they then stayed at a house in or around Laredo until March 7, 2008.[5]

Both sisters further testified that on March 7, 2008, they were taken by truck to a parked trailer. The sisters testified that they and other aliens got into the trailer, which contained automobile parts, and covered themselves with a blue tarp. Eusebia also testified that she saw a man standing outside the trailer who was wearing a cap, had a mustache, and was "not so tall, not so short." Both sisters testified that, after some time, the tractor pulling the trailer experienced mechanical problems, and all of the aliens got out of the trailer to wait for a truck to transport them back to the house where they were staying. Eusebia and Luisa testified that while waiting for the truck, they sat in the tractor that had been pulling the trailer. Eusebia also testified that the same man that she had seen earlier—the one with a mustache and cap—was sitting in the driver's seat.

The sisters also testified that on the night of March 9, 2008, they and other aliens were transported back to the same parked trailer. Eusebia testified that as she was approaching the trailer, she again saw the same man, with a mustache and beard and wearing a cap, that she had seen on March 7. When asked if the man she had seen was present in the courtroom, Eusebia identified Delgado as the person she had seen. On cross-examination, when Delgado asked why Eusebia was unable to identify Delgado or provide more information regarding his appearance on March 9, Eusebia testified that she had been scared and confused that night but that, on further reflection, she realized that Delgado was the man she had seen on March 7 and 9.

---

[5] In their statement given to the Border Patrol on March 9, 2008, the sisters each claimed to have entered the United States on March 8, 2008. However, at trial, the sisters recanted that statement, claiming that they had been confused by the Border Patrol's questions when they stated that they had entered the United States on March 8, 2008.

No. 08-41214

Luisa also testified that, while being loaded into the trailer on March 9, she saw a man, with a mustache and beard who was wearing a cap. Luisa further testified that this man told her to remain quiet while she was in the trailer. When asked if the man she had seen was present in the courtroom, Luisa also identified Delgado as the person she had seen.

Both sisters testified that, after again lying down in the trailer and covering themselves with a blue tarp, they traveled for approximately 30 minutes before the tractor trailer stopped. After some time, immigration officials opened the trailer and uncovered them and the other aliens.

Delgado did not re-urge his motion to suppress the sisters' identification testimony at trial; however, he did extensively cross-examine both sisters regarding the information they provided to the Border Patrol. At the close of the sisters' testimony, Delgado moved for a judgment of acquittal on the grounds that the material witnesses, Eusebia and Luisa, were not credible. Specifically, Delgado argued that the sisters' motivation in testifying for the Government was to keep their family together, that the sisters had been coached in their testimony, and that the descriptions the sisters had given of Delgado were exceedingly generalized. The district court denied the motion, stating that Delgado's arguments raised credibility questions that were best left for the jury.

The case was then submitted to the jury, which returned a guilty verdict on both counts of the indictment. The district court sentenced Delgado to 30 months of imprisonment on each count, the sentences on both counts to run concurrently. Delgado now appeals.

## DISCUSSION

On appeal, Delgado argues that the out-of-court identification procedure used was impermissibly suggestive and unconstitutional. Specifically, Delgado challenges the manner in which the sisters were shown Delgado and subsequently questioned about him. Delgado urges that the subsequent

identification testimony should have been suppressed because it was not reliable in light of the totality of the circumstances.  We disagree.

In reviewing a motion to suppress identification testimony, "'we accept the district court's findings of fact unless they are clearly erroneous, but we review *de novo* the court's ultimate conclusion of the constitutionality of the law enforcement action.'" *United States v. Moody*, 564 F.3d 754, 762 (5th Cir. 2009) (quoting *United States v. Guidry*, 406 F.3d 314, 319 (5th Cir. 2005)).  In undertaking this inquiry, we may "consider the evidence admitted at both the suppression hearing and the trial." *United States v. Jones*, 239 F.3d 716, 718 (5th Cir. 2001).  Whether an identification is constitutionally admissible is a mixed question of law and fact. *Moody*, 564 F.3d at 762.

"The Due Process Clause protects against the use of evidence obtained from impermissibly suggestive identification procedures." *Id.* (citation and internal quotation marks omitted). "The admissibility of identification evidence is governed by a two-step test. . . ." *Id.* (quoting *Guidry*, 406 F.3d at 319).  First, we ask whether the identification procedure was impermissibly suggestive.  Second, we ask whether the procedure used posed a "very substantial likelihood of irreparable misidentification." *Id.* (quoting *Guidry*, 406 F.3d at 319). Identification testimony is inadmissible only if both questions are answered in the affirmative. *Id.*  The linchpin of the admissibility inquiry is whether the identification is reliable. *Manson v. Brathwaite*, 432 U.S. 98, 114 (1977).

"[T]he practice of showing suspects singly to persons for the purpose of identification, and not as part of a lineup, has been widely condemned." *Allen v. Estelle*, 568 F.2d 1108, 1112 (5th Cir. 1978) (internal punctuation, quotation marks, and citations omitted).  However, even if an out-of-court identification procedure was impermissibly suggestive in violation of a defendant's due process rights, the resulting identification testimony may still be admissible if it is reliable in light of the totality of the circumstances. *Amador v. Quarterman*, 458

6

F.3d 397, 414 (5th Cir. 2006). An identification is reliable if the identification procedures did not pose a "substantial likelihood of irreparable misidentification[;]" i.e., it meets the second *Brathwaite* prong. *Id.* If we determine that an identification meets the second *Brathwaite* prong, we need not examine whether the identification procedures satisfied the first *Brathwaite* prong to determine that the resulting identification is admissible. *Moody*, 564 F.3d at 762 n.10 (citing *Coleman v. Quarterman*, 456 F.3d 537, 544 (5th Cir. 2006)). In assessing whether identification procedures posed a substantial likelihood of irreparable misidentification, we consider several factors: "(1) the opportunity of the witness to view the criminal at the crime scene; (2) the witness's degree of attention; (3) the accuracy of the witness's prior description of the criminal; (4) the level of certainty demonstrated by the witness at the confrontation; and (5) the length of time between the crime and the confrontation." *See id.* at 762–63 (quoting *Coleman*, 456 F.3d at 544).

The out-of-court identification procedures here did not pose a substantial likelihood of irreparable misidentification. First, Eusebia and Luisa had multiple opportunities, before they were shown Delgado by the Border Patrol agents, to view Delgado: The sisters twice had the opportunity to view the individuals involved in their transport while being loaded into the trailer, and both sisters sat in the tractor on March 7, with Eusebia testifying that Delgado was also present. Factor one therefore weighs in favor of reliability. *Cf. Amador*, 458 F.3d at 415 (factor one weighed in favor of reliability where witness had an opportunity to view defendant when they rode together in a taxicab); *Coleman*, 456 F.3d at 544 (factor one weighed in favor of reliability when witness, who was sitting in a car, had the opportunity to see the defendant when the defendant fired upon the car).

Second, Eusebia and Luisa were not engaged in other activities during their transportation, and they could thus focus on the people aiding them.

Factor two therefore weighs in favor of reliability. *See Moody*, 564 F.3d at 763 (factor two weighed in favor of reliability where witness was focused on the crime in question and that crime was the "primary activity taking place at the time" (emphasis omitted)).

Third, the record is unclear concerning whether Eusebia and Luisa provided descriptions of Delgado prior to viewing him. Assuming (contrary to the Government's argument) that the sisters did not provide descriptions of Delgado before the out-of-court identification, the third factor weighs neither for nor against reliability. *See Moody*, 564 F.3d at 763 (holding that a defendant cannot rely on the third factor when there is "no testimony" regarding the witness's description of the defendant before the out-of-court identification). As such, we assume *arguendo* that factor three weighs neither for nor against reliability here.

Fourth, upon being shown Delgado at the Border Patrol station, Luisa identified him, without reservation. And though Eusebia was unable to confirm that Delgado was the man she had seen, her initial inability to identify Delgado is not dispositive. *See Amador*, 458 F.3d at 415 (holding that subsequent identification testimony could still be reliable even where witness was initially "reluctant to identify anyone until she was confident in her identification"). Additionally, at trial, neither Luisa nor Eusebia hesitated in identifying Delgado in open court, and, even after extensive cross-examination, both sisters testified consistently about Delgado's appearance and the events in question. Given Luisa's confidence at the out-of-court identification, the sisters' confidence in identifying Delgado in court, and the consistency of the sisters' testimony, we conclude that factor four weighs in favor of reliability. *See Moody*, 564 F.3d at 763 (finding in favor of reliability where description of defendant throughout examination was consistent); *Amador*, 458 F.3d at 415 (unchanging description of suspect at trial found to weigh in favor of reliability).

No. 08-41214

Fifth, Eusebia and Luisa had the opportunity to identify Delgado within days of their initial opportunity (on March 7) to view him and within hours of their subsequent opportunity (on March 9). Factor five therefore weighs in favor of reliability. *See Moody*, 564 F.3d at 763 (concluding that an identification made only a day or two after the incident weighed in favor of reliability); *Coleman*, 456 F.3d at 544 (determining that nine day wait between incident and identification weighed in favor of reliability).

Ultimately, as in *Brathwaite*:

> we cannot say that under all the circumstances of this case there is a very substantial likelihood of irreparable misidentification. Short of that point, such evidence is for the jury to weigh. We are content to rely upon the good sense and good judgment of American juries, for evidence with some element of untrustworthiness is customary grist for the jury mill. Juries are not so susceptible that they cannot measure intelligently the weight of identification testimony that has some questionable feature.

*Brathwaite*, 432 U.S. at 116 (citation and internal quotation marks omitted). Accordingly, we conclude that the out-of-court identification procedures here did not lead to a very substantial likelihood of irreparable misidentification, and we answer the second *Brathwaite* inquiry in the negative. Thus, we need not examine the first *Brathwaite* inquiry—whether the out-of-court identification procedures were unduly suggestive—to conclude that the district court properly denied the motion to suppress the identification testimony and properly left the identification testimony for the jury to consider. *Amador*, 458 F.3d at 415; *Coleman*, 456 F.3d at 544.

## CONCLUSION

For the foregoing reasons, we AFFIRM the judgment of the district court. AFFIRMED.

9